UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

ISMAEL OMAR and GILGILA AHMED,       )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )          Case No. 1:22-cv-00844-CCR
                                      )
GEA NORTH AMERICA, INC., d/b/a Gea    )
Westfalia Separator, as Successor in Interest to  )
Westfalia Separator, Inc.,            )
                                      )
          Defendant.                  )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO**
**EXCLUDE EXPERT C. MARTIN NOWLAND AND**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 47)

On September 27, 2022, Ismael Omar and Gilgila Ahmed (collectively,

"Plaintiffs") brought suit against GEA North America, Inc. ("GEA US") in the Supreme

Court of the State of New York, which was removed to this court on November 4, 2022

on the basis of diversity jurisdiction.[1]

Mr. Omar asserts strict products liability, negligence, and breach of warranty

claims against GEA US related to his injury resulting from a piece of machinery. His

wife, Ms. Ahmed, asserts a loss of consortium claim against GEA US. Plaintiffs concede

that Mr. Omar's manufacturing defect claim has been abandoned. *See* Doc. 70. This

claim is therefore DISMISSED. Remaining claims before the court are Mr. Omar's

failure to warn of defect, design defect, negligence, and breach of warranty claims and

Ms. Ahmed's loss of consortium claim.

On September 17, 2025, GEA US filed a motion to exclude the testimony of

---

[1] The court dismissed Plaintiffs' claims against Defendants Rockwell Automation, Inc. and
Rexel USA, Inc. on November 14, 2024.

Plaintiffs' expert, C. Martin Nowland, and for summary judgment. (Doc. 47.) On October 31, 2025, Plaintiffs opposed the motion, (Doc. 58), and GEA US replied on November 14, 2025. (Doc. 59.) The court heard oral arguments on the motion on February 12, 2026 (the "February 12, 2026 Hearing").[2]

Plaintiffs are represented by Gregory P. Krull, Esq., and Melissa Dorothy Wischerath, Esq. GEA US is represented by Brian P. Crosby, Esq., C. Christopher Bridge, Esq., Matthew T. Wagman, Esq., Timothy J. Graber, Esq., Kyle Williams Dukmen, Esq., and Robert J. Mullins, II, Esq.

## I.    Factual and Procedural Background.

### A.    Undisputed Facts.

GEA US sells and services industrial mechanical equipment, including a MSE 300 Whey Clarifier machine (the "Whey Clarifier"). Lactalis American Group, Inc. ("Lactalis") produces and sells dairy products and employed Mr. Omar as a cheesemaker for approximately nineteen years prior to his injury at issue in this action.

In or around March 1998, GEA US sold Lactalis's predecessor company a Whey Clarifier. The Whey Clarifier was designed and manufactured by GEA US's parent company which is not a party to this suit. "The Whey Clarifier is a complex centrifuge that requires proper training to use the machine safely." (Doc. 47-2 at 2-3, ¶ 5) (citation omitted).

Lactalis's predecessor company installed the Whey Clarifier, and after this, "GEA US service technicians arrived at Lactalis's plant to program the Whey Clarifier machine to Lactalis'[s] specifications and to 'commission' it, making it [] ready-for-use in production." *Id.* at 2, ¶ 4 (citations omitted). Since 1998, Lactalis's predecessor company and Lactalis have used the Whey Clarifier in their ricotta cheesemaking process.

The Whey Clarifier receives liquid whey, a byproduct from the making of cheese, and a high-speed centrifugal force of rotating discs within a bowl separates out cheese

---

[2] The court also heard oral arguments on Plaintiffs' November 21, 2025 motion to strike from GEA US's reply papers any reference to GEA US's experts and expert report. At the February 12, 2026 Hearing, the court GRANTED IN PART and DENIED IN PART that motion.

"fines" from the liquid whey and retains them for use in making cheese. Once in use, it takes approximately sixty minutes for the bowl inside the Whey Clarifier to stop spinning.

The Whey Clarifier has three modes of operation: (1) production mode, during which cheese is being made; (2) cleaning in place ("CIP") mode, during which internal parts of the machine are being cleaned; and (3) idle mode, during which the operator is neither making cheese nor cleaning the machine. During the CIP process, an operator adds caustic solution and acid to the Whey Clarifier in order to clean it. The Whey Clarifier conducts pre-programed ejections/discharges to remove product build up or cleaning solution from the bowl.

### 1.    The Whey Clarifier's Instruction Manual.

At the time of commissioning the Whey Clarifier, GEA US provided Lactalis with an instruction manual (the "Instruction Manual"), which was thereafter kept in Lactalis's maintenance department and available to all employees. Mr. Omar testified that he had never seen the Instruction Manual prior to his injury on September 30, 2019.

Section 1.2 of the Instruction Manual is titled "1.2 Safety Stickers on the Machine" and states that "[t]he following warnings must be attached to the [Whey Clarifier] as self-adhesive stickers[,]" including a sticker depicting an on/off switch, and that "[t]he stickers must always be in perfect condition. Clean dirty stickers. Replace damaged stickers." *Id.* at 10, ¶ 41 (internal quotation marks and citations omitted).

Regarding the on/off switch sticker, the Instruction Manual warns that, before maintenance and servicing, an operator should "switch off all electrical appliances via the main switch, [and] secure installation against unintended re-starting with locking devices." (Doc. 50-4 at 15.) Another safety sticker depicts a wrench and the Whey Clarifier's hood with arrows indicating that the bowl is spinning within a crossed-out circle, and with respect to this sticker, the Instruction Manual states: "Do not loosen any part before the bowl has come to standstill." *Id.* at 16 (emphasis omitted). The Instruction Manual reiterates this command in Section 5.2: "CAUTION: To prevent accidents, do not loosen any parts before the bowl has come to a standstill! The bowl has stopped rotating

3

when the LED 'Bowl standstill' lights up." *Id.* at 42 (emphasis omitted).

### 2.    Mr. Omar's Employment and Training.

Mr. Omar was a cheesemaker in Lactalis's Ricotta Production Department and was regularly assigned to operate the Whey Clarifier during the approximately nineteen years he worked there prior to his injury. GEA US "did not train Mr. Omar on how to safely use the Whey Clarifier as Mr. Omar was trained to use the Whey Clarifier 'on-the-job' by his employer, specifically by two co-workers named Douglas Nicolli and Saleh Nassar." (Doc. 47-2 at 4, ¶ 12) (citations omitted).

### 3.    Mr. Omar's Injury.

On September 30, 2019, Mr. Omar, who was not assigned to the Whey Clarifier at the time, was working at around midnight and noticed the Whey Clarifier had a leaking Wilden Pump, "which was a machine neither manufactured nor supplied by GEA US." *Id.* at 5, ¶ 16 (citations omitted). The Whey Clarifier's assigned operator, Wasyl Nakonecznyj, was on a break.

At the time, the Whey Clarifier was operating in CIP mode whereby the machine circulates a combination of water, caustic solution, and acid to clean its internal components which mixture it then ejects into a drain. Mr. Omar did not report the leak to Lactalis's maintenance department or to his supervisor but instead attempted to fix it himself. To do so, he pressed the "Hold Closed Feed and Flush Valve F3" (the "F3 Hold") button on the Whey Clarifier's control panel, which he believed effectively shut down the machine such that it would no longer conduct an ejection/discharge and would allow him to break the line, meaning to disconnect the clamps and piping, in order to reattach the gasket and clamp that had fallen off the Wilden Pump. The Whey Clarifier's control panel displays a countdown of the time until its next programmed ejection/discharge, which was visible to Mr. Omar when he approached the control panel.[3]

---

[3] GEA US has provided evidence that the Whey Clarifier's control panel displays a countdown indicating the time remaining until its next discharge. Plaintiffs "[a]dmit" this fact but point out that GEA US relies on photos taken after Mr. Omar's injury to support its assertion. (Doc. 58 at

4

In repairing the Wilden Pump, Mr. Omar detached the Whey Clarifier's "elbow" pipe in order to reattach the dislodged clamp and gasket which were the source of the leak. After detaching the elbow, Mr. Omar stood up and, at the same time, the Whey Clarifier proceeded to conduct its pre-programmed ejection/discharge. Because the elbow pipe Mr. Omar removed was detached, the discharge sprayed onto Mr. Omar who was subsequently burned on both of his legs as well as his right foot.[4] Prior to this, Mr. Omar had not been injured when "working with and around the Whey Clarifier[.]" *Id.* at 4, ¶ 11 (citations omitted).

### 4.    The F3 Hold Button.

When the F3 Hold button is pressed, the bowl within the Whey Clarifier continues to spin but the feed valve, which supplies product into the Whey Clarifier, and flush valve, which supplies water, are closed. The Whey Clarifier machine is designed and manufactured to continue preprogrammed ejections/discharges when the F3 Hold button is pressed to maintain the safe operation of the machine.[5]

In its Fed. R. Civ. P. 30(b)(6) deposition, Lactalis testified that the F3 Hold button "simply closes the feed and flush valves[,]" *id.* at 7, ¶ 24 (citation omitted), and Plaintiffs' expert witness, C. Martin Nowland, testified that, from "common sense[,]" a person would be able to understand these functions of the F3 Hold button. (Doc. 49-6 at 49:24-50:3.) Lactalis further testified that the Whey Clarifier otherwise continues to

---

3, ¶ 20.) Plaintiffs, however, provide no evidence of the Whey Clarifier's control panel without a countdown, evidence that this model did not offer a countdown, or photos prior to Mr. Omar's injury that demonstrate this feature did not exist, and the court thus deems this fact undisputed.

[4] GEA US notes that Mr. Omar was wearing his pants tucked into his boots at the time of the accident when Lactalis allegedly required its employees to wear their boots over their pants. Plaintiffs contend that it was the custom and practice of Lactalis employees to wear their pants tucked into their boots. Any dispute regarding this issue is not material to a summary judgment determination.

[5] "Specifically, the ejections/discharges keep the machine's bowl clean of liquid and/or product." (Doc. 47-2 at 6, ¶ 23) (citation omitted). If no ejections/discharges were to occur, "the bowl spins at a high rate of speed at a high temperature, which will bake or harden whatever is in the machine onto the machine's bowl. This could cause an imbalance of the bowl and unsafe operational conditions." *Id.* (internal citations omitted).

operate and its bowl continues to spin when the F3 Hold button is pressed.

With respect to whether GEA US's Operating Instructions for the Whey Clarifier (the "Operating Instructions") addressed the F3 Hold button, GEA US's manager, Richard Frega, testified that, "looking through [the Operating Instructions,] I don't see anywhere where a[n F3 H]old is referenced at all. I didn't read every single line but – [it] doesn't reference that at all. To my knowledge." (Doc. 58-9 at 23:18-22.) Regarding whether the Instruction Manual addressed the F3 Hold button, Mr. Frega stated: "I don't have the whole [Instruction M]anual memorized but I don't think there's any reference to a feed and flush hold in our [I]nstruction [M]anual[]." *Id.* at 24:25-25:2.

### 5.    Occupational Safety and Health Administration ("OSHA") Lock Out/Tag Out ("LOTO") Standards.

OSHA's LOTO standards are designed to protect workers from injuries caused by "unexpected energization, startup, or release of stored energy" in machinery and equipment during service and maintenance. (Doc. 47-2 at 12, ¶ 48.) OSHA's LOTO safety standards applied to Lactalis generally, and "[i]t was Lactalis's responsibility to properly train Mr. Omar on LOTO procedures." *Id.* at ¶ 49 (citation omitted).

Mr. Omar was trained on proper LOTO standards when he was first hired by Lactalis and annually thereafter, but he did not follow those procedures when attempting to repair the leaking Wilden Pump on September 30, 2019. Plaintiffs' expert, Mr. Nowland, testified that if Mr. Omar "had followed OSHA's LOTO standard," "he wouldn't have been injured[.]" (Doc. 51-2 at 96:20-21.)

### 6.    Lactalis's Lock Out Procedures for the Whey Clarifier.

Lactalis stored laminated sheets, describing how the Whey Clarifier operated, in its control panel for operators. One laminated card on the control panel provides a "Lock Out Procedure[,]" specifically "for Service [and] Repair Work[.]" (Doc. 51-3 at 1) (capitalization removed). When conducting service and repair work, the Lock Out Procedure requires an operator to "turn off circuit breaker in . . . volt distribution panel or frequency drive panel [and] disconnect switch located in main plant power room[.]" *Id.* (capitalization removed). In its Fed. R. Civ. P. 30(b)(6) deposition, Lactalis testified that

6

an operator must comply with its Lock Out Procedure when "breaking a line in general on a machine" but need not comply with its Lock Out Procedure "when a line needs to be broken during a CIP process[.]" (Doc. 58-1 at 28:8-19.) Mr. Nowland testified that, "if Mr. Omar had followed" Lactalis's Lock Out Procedure, "he wouldn't have been injured[.]" (Doc. 53-12 at 102:12-17.)

### 7.    Lactalis's Line Breaking Policy.

Lactalis had implemented a South Park Line Breaking Permit Policy (the "Line Breaking Policy") effective as of July 1, 2018. Section 4.1 of the Line Breaking Policy stated that its "requirements . . . apply to all Lactalis employees and contractors on Lactalis property." (Doc. 47-2 at 13, ¶ 56) (internal quotation marks and citation omitted).

The Line Breaking Policy required Lactalis employees to obtain a permit prior to "opening any line that may contain hazardous materials other than fire sprinkler lines or the daily disconnecting/reconnecting (e.g. CIP/Process lines, milk receiving trucks) of process lines." (Doc. 51-7 at 2) (emphasis omitted). Under the Line Breaking Policy, "[a] material is deemed hazardous if it can be harmful to personnel such as hot and extreme cold, toxic, corrosive, high pressure (above 30 psi), flammable[,] or explosive" materials. *Id.* The Line Breaking Policy did "not apply to those pipe connections currently engineered for every[]day opening and closing, such as process/CIP lines[]" but applied "to all pipelines that require the removal of flange bolts, cutting of lines, or opening of chemical lines at any point other than those for CIP." *Id.* at 1.

Mr. Omar did not obtain a permit pursuant to the Line Breaking Policy before removing the elbow pipe from the Wilden Pump and attempting to repair it on the Whey Clarifier. The Line Breaking Policy also required employees to complete thirteen steps "prior to the opening of [a] line[,]" which Mr. Omar also did not follow. *Id.* at 2. Mr. Omar "was not even certain what the Line Breaking [] Policy was and whether he followed it." (Doc. 47-2 at 14, ¶ 59) (citations omitted). Mr. Nowland testified that if Mr. Omar had "followed . . . Lactalis's [Line Breaking Policy], he would have had more time to fix the leak safely[.]" (Doc. 53-12 at 123:11-13.)

7

On the same day of Mr. Omar's incident, Lactalis issued a "Line Breaking Policy Refresher" explaining that:

- Per the Line Breaking Policy[,] anyone opening any line that may contain a hazardous material (toxic, active corrosive CIP, hot/cold temperature, 30 psi pressure, flammable[]) must follow the written Line[]Breaking [] Policy. This will include not to attempt to repair leaks of any process line while in active CIP mode. Any active CIP line cannot be opened to repair leaks until the line is flushed and rinse[d] without any possible exposure to CIP solutions. All CIP lines are to be inspected for leaks during the water rinse before the CIP mode is engaged.

- Provide temporary cover of any leak that may occur during CIP, this includes to secure the immediate area to prevent possible employee exposure to CIP solutions. Wear PPE[] (face shield, apron, gloves[,] and pants over boots) while working with chemicals.

(Doc. 51-15 at 1.)[6]

Although the timeframe of its creation and issuance is unknown, the control panel of the Whey Clarifier currently contains the following notice to all employees: "Attention All: Changing from one mode to another mode on the [Whey C]larifier causes a desludge. Also, placing the feed valve on hold does not pause the desludge timer, the [Whey C]larifier will still do a full and partial shoot. Any questions[,] see your supervisor." (Doc. 47-2 at 15, ¶ 62) (alterations adopted) (internal quotation marks omitted) (quoting Doc. 51-18 at 1).[7]

### B. Disputed Facts.

GEA US claims that the Whey Clarifier at Lactalis was programmed to perform a discharge every four minutes. In contrast, Plaintiffs claim the Whey Clarifier's rate of discharge depends on the selected mode. The Operating Instructions indicate that, when in CIP mode, "[t]he [Whey] Clarifier will discharge every [ten] minutes[,]" (Doc. 58-10 at 2), but a manager for GEA US testified that he "doesn't 'know for sure' if that was

---

[6] It is unclear whether this is a subsequent remedial measure and, if so whether Fed. R. Evid. 407 renders it inadmissible. The parties have not briefed the issue.

[7] *See supra* note 6.

8

how the subject [] Whey Clarifier was set up[.]" (Doc. 58 at 13, ¶ 93) (citation omitted).

GEA US asserts that "the only time Lactalis employees would need to utilize the 'Hold . . . F3' button is during the production mode while making cheese[,]" (Doc. 47-2 at 7, ¶ 27), while Plaintiffs point out that "Lactalis Whey Clarifier operators utilized the F3 Hold button during CIP mode[.]" (Doc. 58 at 4, ¶ 27) (citations omitted). They claim that Lactalis's other operator of the Whey Clarifier, Mr. Nakonecznyj, "followed the same procedures and methods Mr. Omar did when repairing similar gasket/pipe leaks during CIP[.]" *Id.* at 15, ¶ 98. Mr. Nakonecznyj testified that he had experienced a clamp blowing off the Wilden Pump during the Whey Clarifier's production mode and that he would do the following in response:

> [Mr Nakonecznyj:] I would stop the product, turn off the pump.
>
> [GEA US's Counsel:] When you say stop the product, you mean turn off the machine or what do you mean by stop the product?
>
> [Mr Nakonecznyj:] No, no, the machine would still be . . . the clarifier would still be spinning, but you wouldn't have any product going through it, through the whey. You would just turn off the source of the whey. You would close the valves, . . . F3 is a hold for . . . those valves, so you put them on hold. . . . Then I would replace the . . . clamp or the gasket.

(Doc. 58-3 at 16:10-17:3.)

According to GEA US, the F3 Hold button "close[s] the [Whey Clarifier]'s valves, such that no more product or liquid is coming into the machine[,]" but it does not "otherwise change the mode the [Whey Clarifier] is already in, meaning [it] will proceed with timed ejections/discharges." (Doc. 47-2 at 6, ¶ 21.) It contends pressing the F3 Hold button in CIP mode causes "no more caustic solution or acid [to] enter the [Whey Clarifier], but [it] will continue to perform the pre-programmed interval ejections/discharges of the material that remains in [it]." *Id.* at ¶ 22. Plaintiffs contend that the Whey Clarifier is not "fully operational when F3 Hold is pressed as feed and flush valves are closed[]" and that Mr. Omar and Mr. Nakonecznyj, "testified desludging ejections are stopped [when the F3 Hold button is pressed]." (Doc. 58 at 4, ¶ 29.)

With respect to the September 30, 2019 incident, GEA US avers that Mr. Omar thought the Whey Clarifier's bowl had stopped spinning after pressing the F3 Hold

9

button while Plaintiffs assert that Mr. Omar was aware the bowl was still spinning. Although GEA US contends that Mr. Omar failed to follow OSHA's LOTO standards and Lactalis's Lock Out Procedure and Line Breaking Policy in repairing the Whey Clarifier's Wilden Pump, Plaintiffs counter that Mr. Omar was not required to follow those procedures during CIP mode.

### C.    Mr. Nowland's Opinions.

Plaintiffs retained an electrical engineering expert witness, Mr. Nowland, who describes his qualifications in his expert report as follows:

> I am a licensed professional engineer in multiple states. I am an expert in the fields of electrical engineering and control systems, which includes the design and design-build of various types of commercial and industrial skids, trailers, and facilities. I am an electrical and controls engineer with over thirty years' experience evaluating, designing, building, programming, configuring, modifying, and commissioning electrical and controls infrastructure, including designing and researching custom equipment or systems, consulting, expert witness support, and patent work. I have worked with control systems in various applications, and I am familiar with technical design associated with industrial processes, equipment, code compliance, safety, electrical components, and systems. I am a member of the Institute of Electrical and Electronics Engineers ("IEEE"), National Society of Professional Engineers ("NSPE"), National Fire Protection Association ("NFPA"), American Society of Heating, Refrigeration, and Air Conditioning Engineers ("ASHRAE"), and Association of Energy Engineers ("AEE"). . . . I have testified in one deposition and have not supported a trial of any matter. I have not authored any technical publications in the last 10 years.
>
> I have many years' direct experience with the exact programmable controller and operator interface hardware and software utilized in the [W]hey [C]larifier which is the subject of this case. When I was at Ionics, Inc. . . . , I designed, had fabricated, programmed, tested, and commissioned dozens of water purification system skids, trailers, and entire plants. Subsequently, at CHI Engineering Services, Inc.[,] I continued similar control systems work in gas facilities. At Waldron Engineering and Construction, Inc.[,] I was the department manager for control systems for four years.

(Doc. 52-4 at 1-2.)

From his CV, Mr. Nowland appears to have served as an expert witness in three

other cases, at least two of which were federal cases. Mr. Nowland's highest level of education is a college degree in electrical engineering from Worcester Polytechnic Institute. He has over thirty years of experience in electrical engineering positions at various companies from 1994 to the present. From 2009 to the present, Mr. Nowland has held positions as an electrical and controls engineer, during which he has overseen projects designing and developing control panels for industrial equipment. Mr. Nowland offers his opinions and testimony "of [a] design defect, but not a manufacturing defect nor failure to warn [defect]." (Doc. 58 at 10, ¶ 70.) He has worked around a centrifuge for one day, during which he consulted on a machine that separated egg yolks from whites.

Mr. Nowland offers five opinions in his report, three of which he has retracted.[8] Mr. Nowland's remaining opinions are Opinion 1 and Opinion 4. Opinion 1 states: "The F3 Hold and F2 Release pushbuttons on the [Whey Clarifier's] control panel . . . are a safety hazard." (Doc. 52-4 at 13.)

In his report, Mr. Nowland explains Opinion 1 as follows:

[P]ressing the F3 Hold on the operator interface screen holds the clarifier feed and flush valves closed forever. This is a manual operation initiated by the operator and the only action that releases the two valves back to [programmable logic controller] control is by the operator pressing F2 Release on the PanelView operator interface screen.

There are potential hazards. If the machine runs in Idle Mode forever without operator intervention, the flush water periodically added to the bowl for cooling would eventually fill the bowl, overflow, and continue. Water spilling on the floor may or may not be an issue depending on whether the floor is sloped toward floor drains or somewhere else. If water pools on the floor because it is uneven or floor drains clog, the spilling water could become an electrical shock hazard. Additionally, if running forever, the electricity bill would be huge and the wasted flush water would be significant.

If running in the CIP Mode, and the operator selects F3 Hold, the clarifier feed and flush valves close and are held closed. The automatic CIP continues stepping through the program to clean the machine with caustic, acid, and rinses (not in that order). It appears that Mr. Omar believed he

---

[8] Mr. Nowland withdrew his second, third, and fifth opinions in his deposition, and Plaintiffs' counsel conceded these opinions were withdrawn at the February 12, 2026 Hearing.

could fix the pipe clamp without CIP bowl discharge, which he believed was precluded by operation of the F3 Hold.

A little paper sign was added to the front of the clarifier control panel following Mr. Omar's injury. The few clarifier operators had many years' experience in operating the machine, therefore, they are presumptively fully knowledgeable in operation of the cheese-making machine. This little sign seems to be an attempt to provide extra instructions following the injury to make up for the lack of documentation and instructions for operation of the clarifier. This reinforces the concept that the F3 Hold (counter-intuitively) did not completely halt clarifier processes giving the operator a way to pause operation.

Why did GEA not provide a CIP Hold control function key to stop the automatic CIP process or incorporate this into the F3 Hold function? At the time Mr. Omar discovered the chemical leak, he had an automatic CIP process running and needed a way to stop the CIP flow so that he had more time to fix the leak. The F3 Hold could be left on forever, or until he as the operator, remembered to press the F2 Release pushbutton. If CIP flow was inhibited as part of the F3 Hold, the incident could have been averted.

*Id.* at 14 (footnote omitted).

Regarding his proposed CIP Hold button, the following colloquy took place at Mr. Nowland's deposition:

[GEA US's counsel:] And I'm asking you if you've thought about any other potential hazards that would be present if that CIP [H]old button, as you've articulated, were implemented? . . .

[Mr. Nowland:] So the bowl could get imbalanced if they . . . allowed it to get too hot. If it went on forever, you'd have to have a time limit. If it went on forever, the [Whey Clarifier] could overflow. I don't know. Those are some of the things that just come up.

[GEA US's counsel:] Right. So what would you do? I'm asking you.

[Mr. Nowland:] That's what I would do. I would – you have to – when you design something, you have to first think about all the hazards involved, go through it, figure out the logic, and then implement it. So –

[GEA US's counsel:] Okay.

[Mr. Nowland:] – that's a process hazard – [hazard and operability study] or a process safety review does that. If you want me to go through that – I mean, that's my first step to start that process. There's a lot more involved in that process. You have to look at pressures. You have to look at temperatures. You have to look at flows. You have to look at the whole

12

process in the system and evaluate it all. So . . . I'm not prepared to do that here today.

(Doc. 53-2 at 129:8-130:10.)

Mr. Nowland's Opinion 4 states that "[t]he lack of accurate documentation and training poses safety risks that were exposed by Mr. Omar's incident and injuries." (Doc. 52-4 at 17) (emphasis omitted). In rendering Opinion 4, Mr. Nowland explains:

> I spent nearly a month full-time reviewing testimony, manuals, drawings, pictures, programming, and other exhibits in this case, and I could not find a simple, valuable procedure how to operate the clarifier and associated equipment in the Lactalis processing plant. The closest document to a clarifier operating procedure was the Operating Instruction . . . . This document was badly written, included pieces and parts pasted together, and is far from a concise and complete procedure. I would not be able to start, operate in Production Mode, make piping changes to set[]up CIP, operate CIP Mode, or make piping changes to finish CIP to be ready for production the next day. I have commissioned dozens of processes and entire plants, and this lack of documentation for a process that has many hazards is disturbing.

*Id.* at 18.

Mr. Nowland cites sources that he relied upon in forming his opinions, including the 2002 edition of National Fire Protection Association ("NFPA") 79, the 1993 version of NFPA 70, 7 C.F.R. § 58.146, OSHA Hazard Communication Standard, U.S. Department of Agriculture Dairy Equipment Review Guidelines, and Underwriters Labs, Inc. ("UL") Standard for Safety for Industrial Control Panels 503A.[9]

With respect to using the 2002 edition of NFPA 79, Mr. Nowland indicated, "I could not find a copy of the 1994 or 1997 version anywhere. I have a copy of the 2002 edition, so that is the best I can do." (Doc. 53-5 at 2.) In his report, Mr. Nowland opines that the Whey Clarifier failed to meet the requirements of NFPA 79, but during his deposition, Mr. Nowland acknowledged that he used the "incorrect version" of NFPA 79 and that he "would have to consider rewriting" that portion of his report "if I was going to lean on [it]." (Doc. 53-6 at 142:8-9, 144:3.) Mr. Nowland also conceded that he had

---

[9] UL is a rulebook with safety standards for industrial control panel safety.

13

not reviewed the 1997 version of NFPA 79 and that he did not draft a supplemental report. *See id.* at 145:15-18 ("I don't know the answer to that right now because I haven't actually reviewed the [1997 version of NFPA 79] standard in detail on that. I just obtained it. I didn't have time to really spend a lot of time.").

In Mr. Nowland's deposition, when queried, "[c]an you provide me with a single source in the field of engineering that would support your opinion that the [W]hey [C]larifier doesn't comply with . . . NFPA 70[?]" (Doc. 52-16 at 156:21-25), Mr. Nowland responded:

> Off the top of my head right now, I don't think so, but it's possible because NFPA 70 . . . references NFPA 70E, and I believe that was in effect back in 1997, and that has to do with safety, electrical safety. And I haven't reviewed that to see if there's anything in there. I don't believe there is, but I haven't reviewed it for this case.

(Doc. 53-8 at 157:1-8.)

## II.    Motion to Exclude Plaintiffs' Expert C. Martin Nowland.

### A.    Standard of Review.

Expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 requires the court to serve as gatekeeper for expert testimony, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining the reliability of expert testimony, the court engages in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Under *Daubert* and its progeny,

14

relevant factors to assess reliability include:

> (1) whether a theory or technique "can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community[.]

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (quoting *Daubert*, 509 U.S. at 593-94). "The proponent of the expert testimony has the burden to establish these admissibility requirements[.]" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).

"[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). In determining whether an expert witness's testimony is admissible, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The court must "make certain that an expert, whether basing [his or her] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 265-66 (internal quotation marks omitted) (quoting *Kumho Tire*, 526 U.S. at 152).

An expert opinion should be excluded if it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," if it "is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]" *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020) (alteration adopted) (internal quotation marks and citations omitted). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.*

(internal quotation marks omitted) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 536 (S.D.N.Y. 2024) ("Rule 702 'embodies a liberal standard of admissibility for expert opinions.'") (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original); *see also Amorgianos*, 303 F.3d at 265 ("[T]he district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case.").

Courts may exclude expert witness opinions when the moving party demonstrates that those opinions are inadmissible and may grant summary judgment if "the admissible evidence is insufficient to permit a rational juror to find in favor of the [non-moving party.]" *Amorgianos*, 303 F.3d at 267. "The standard for admissibility [of an expert witness's opinion] is the same at the summary judgment stage as it is at trial." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party[.] . . . But the question of admissibility of expert testimony is not such an issue of fact[.]").

## B.    Whether Mr. Nowland Is Qualified.

Under Federal Rule of Evidence 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education[.]" "The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on his or her perception[.]'" *Nimely*, 414 F.3d at 396 n.11 (alteration adopted) (citation omitted). "In considering a[n expert] witness'[s]

16

practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 112 (E.D.N.Y. 2019) (internal quotation marks omitted) (quoting *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014)).

"The admission and qualification of experts pursuant to Federal Rule of Evidence 702 is in the broad discretion of the district court." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) (citation omitted). "'Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert.'" *Mobius v. Quest Diagnostics Clinical Lab'ys, Inc.*, 687 F. Supp. 3d 357, 371 (W.D.N.Y. 2023) (quoting *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022)).

"If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Am. Empire Surplus Lines Ins. Co.*, 754 F. Supp. 3d at 539-40 (internal quotation marks and citation omitted). "Assertions that the witness lacks particular educational or other experiential background, go to the weight, not the admissibility, of the testimony." *Id.* at 540 (alteration adopted) (internal quotation marks and citation omitted). "An expert must, however, stay within the reasonable confines of his subject area, and cannot render [an] expert opinion on an entirely different field or discipline." *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (citation omitted), *aff'd sub nom. Lappe v. Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996).

GEA US relies on *Barban v. Rheem Textile Sys., Inc.*, 2005 WL 387660 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 F. App'x 222 (2d Cir. 2005) to argue that Mr. Nowland's lack of experience with the Whey Clarifier renders him unqualified as an expert witness. In *Barban*, the plaintiff asserted strict products liability, negligence, and breach of warranty claims against the manufacturers of a laundry press machine for injuries that the plaintiff

17

sustained when working with the machine. The plaintiff offered a design engineer expert witness, and the *Barban* court excluded his expert testimony, reasoning:

> [The expert witness] conceded at his deposition that he has never designed any machines in any field. He has also never provided testimony, conducted studies, authored articles, or performed any other consulting work, specific to the dry cleaning industry. His only prior experience with pressing machines was forty years ago, when he worked in his father's dry cleaning business. At no time did he design or work on the safety features of pressing machines. He testified that none of the machines with which he had any familiarity had head guards.

> The fact that [the expert witness] has never designed a machine of any kind, and has never worked with laundry machines in any capacity that bears on the conclusions he reaches in this case, compels the [c]ourt to preclude his testimony for the reason that he lacks the requisite qualifications and knowledge authorizing him to testify as an expert witness. As this [c]ourt has previously stated with respect to the admissibility of expert testimony, [the expert witness]'s lack of relevant experience and qualifications plainly conveys "that whatever opinion he will ultimately express as to the cause of" [the p]laintiff's accident, "would be imaginatively speculative."

*Id.* at *3-4 (internal citations omitted).

Similar to the expert witness in *Barban*, Mr. Nowland has never authored or published any articles regarding "the safe design of a clarifier, the safe design of a centrifuge, or the safe design of control panels for industrial equipment." (Doc. 47-1 at 15) (citation omitted). Mr. Nowland has only worked with industrial equipment containing a centrifuge for one day. He has not read any articles on the safe design of whey clarifiers, the safe design of a centrifuge, or the safe design of CIP processes and "only remembers reading some 'standards' years ago but cannot remember them or what they said." (Doc. 47-2 at 22, ¶ 79) (citation omitted). Although Plaintiffs contend that Mr. Nowland has previously "written articles for the safe design of control panels for industrial equipment internal to companies that he was working for[,]" (Doc. 58 at 12, ¶ 78) (citation omitted), no evidence of those articles has been provided to the court or is cited in Mr. Nowland's expert witness report. *See* Fed. R. Civ. P. 26(a)(2)(B)(iv) (stating that an expert witness's report must contain "a list of all publications authored in the previous [ten] years").

18

"In a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility." *Lappe*, 857 F. Supp. at 226 (citation omitted); *see also Hilaire*, 54 F. Supp. 3d at 236 ("An expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'") (citation omitted). Because of this, courts in the Second Circuit have found that an expert witness's testimony regarding a design defect is not excluded merely because he or she lacks experience with the machine at issue, provided that the expert witness has specialized knowledge which would be helpful to the jury.[10]

Mr. Nowland has an engineering degree, is a member of multiple professional engineering societies, including the National Society of Professional Engineers, and has approximately thirty years of experience in designing, engineering, and implementing programming control systems for industrial machinery. Although a close question, his education, skill, experience, and expertise renders Mr. Nowland qualified to offer opinions regarding the Whey Clarifier's control mechanisms and design despite his lack

---

[10] *See, e.g.*, *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 732 (E.D.N.Y. 2016) ("[C]ourts have found that a lack of specific familiarity with a product, machine or specific field does not, in itself, render an expert unqualified to proffer their opinion.") (collecting cases); *Colombo v. CMI Corp.*, 26 F. Supp. 2d 574, 576 (W.D.N.Y. 1998) ("The fact that plaintiffs' expert may not have dealt before with the type of machinery involved is not dispositive.") (collecting cases); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) ("On the basis of his credentials and experience, this court is satisfied that plaintiff's expert is 'qualified' to testify under Fed. R. Evid. 702. Although he does not design automobiles for a living, this expert is a Registered Professional Engineer in the State of New York, and holds degrees in metallurgy [and] material science and bio-medical engineering."), *aff'd sub nom. Lappe v. Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996); *Manzo v. Stanley Black & Decker, Inc.*, 2024 WL 5319230, at *8 (E.D.N.Y. Mar. 20, 2024) ("[A]n expert need not specialize in 'power tools' or a specific type of tool, nor personally design safety features for specific tools to provide helpful context on prevailing safety practices, product design, or warnings.") (collecting cases); *Hamraz v. Diversified Maint. Sys., LLC*, 2023 WL 5200282, at *4 (E.D.N.Y. Aug. 14, 2023) ("Despite [the expert witness]'s lack of expertise or experience with floor strippers, his educational and professional background in chemistry, chemical engineering, including chemical burn injuries and product safety qualify him to provide testimony in this case as to safer rheological properties.") (citations omitted).

of specific experience with the Whey Clarifier and its centrifuge.[11] Mr. Nowland's lack of specific knowledge pertaining to Whey Clarifiers and centrifuges goes to the weight of his opinions rather than their admissibility. *See, e.g., Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 733 (E.D.N.Y. 2016) ("[G]iven [the expert witness]'s overall background, education, training and prior experience in the field of engineering generally, the [c]ourt 'concludes that he is qualified to testify in this case, and his lack of knowledge and experience goes to the weight of his testimony.'") (alteration adopted) (collecting cases).

### C.    Mr. Nowland's Reliance on the 2002 Edition of NFPA 79.

GEA US contends that the court "should preclude Mr. Nowland's testimony related to the 1997 edition of NFPA 79, or at minimum, limit Mr. Nowland to the opinions expressed in his report[]" because Mr. Nowland has conceded the 2002 edition of NFPA 79 "d[oes] not apply to the Whey Clarifier given that it was manufactured in 1998[.]" (Doc. 47-1 at 25-26.) To the extent Mr. Nowland purports to rely on the 1997 version of NFPA 79 to support his opinions, that reliance was not disclosed in his expert report or a supplement thereto, and he disclaimed familiarity with the 1997 version in his deposition.

Under Fed. R. Civ. P. 26(a)(2)(B), an expert witness's report must contain, among

---

[11] *Compare Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 242 (E.D.N.Y. 2014) (finding the expert witness was qualified to testify regarding a table saw design due to his safety engineering background even though "[t]he [c]ourt acknowledge[d] that he has very little experience with the table saw at issue, has not published any articles on saws, and although he claims to have designed a guard for a saw, he declined to provide any details that would allow the defendants and the [c]ourt to evaluate his expertise in this area[]"), *and Manzo*, 2024 WL 5319230, at *8 (finding that, "[b]ased on [the expert witness's] significant experience in engineering, . . . [he] has the 'knowledge, skill, experience, training, and education' required by Rule 702 to offer opinions in this case[]" despite his lack of experience with power tools and arm saws at issue in the case) (alteration adopted), *with Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 431 (E.D.N.Y. 2013) (finding the expert witness was not qualified to testify as to the alleged design defect of a golf cart because "he does not have a degree in mechanical engineering and is not a licensed engineer[,]" "[h]e does not have any special training or expertise related to golf car[t]s, braking systems, restraint systems or warnings[,]" and "has little experience with golf car[t]s, claiming that he developed his expertise by driving a golf car[t] 'every day of the week for two and a half years[]'"), *aff'd*, 559 F. App'x 11 (2d Cir. 2014).

other things, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). "The duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity to prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses." *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 354 (E.D.N.Y. 2021) (internal quotation marks and citation omitted); *see also PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2025 WL 1276513, at *28 (S.D.N.Y. May 2, 2025) ("The purpose of [Rule 26(a)(2)(B)] is to provide certainty to the opposing party, so that it can prepare for trial accordingly. If the expert is permitted to shore up his original report – weeks or months later – with additional facts and data, 'the very purpose of the rule is nullified.'") (citation omitted). "Expert testimony exceeding the bounds of an expert's report is excludable pursuant to Federal Rule of Civil Procedure 37(c)(1)." *Looney*, 588 F. Supp. 3d at 354 (alterations adopted) (internal quotation marks omitted).

Fed. R. Civ. P. 26(e) allows an expert to "supplement or correct its disclosure or response[]" if it is "incomplete or incorrect," Fed. R. Civ. P. 26(e)(1)(A), however, "'incomplete' in Rule 26(e) cannot be expanded to permit a constant stream of 'new' information that was available at the time of the initial report, but not included because of a lack of due diligence." *Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 WL 4157163, at *5 n.5 (S.D.N.Y. Nov. 16, 2007). In other words, "Rule 26(e) 'does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect.'" *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 2025 WL 3296263, at *1 (D. Vt. Nov. 26, 2025) (quoting *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011)).

In determining whether to allow an expert witness to supplement his or her report, a court should consider: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[];

21

(3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (first alteration adopted) (internal quotation marks and citation omitted).

Because the 2002 edition of NFPA 79 was created after the Whey Clarifier was installed in 1998, Mr. Nowland admitted it was inapplicable and stated that he "would have to consider rewriting [his opinions relating to NFPA 79] if [he] was going to lean on [the 1997 version]." (Doc. 53-4 at 142:8-9.) Mr. Nowland did not revise his opinions in his expert report, and Plaintiffs do not explain their failure to comply with Rule 26's supplemental disclosure requirement.[12] The 1997 edition of NFPA 79 was available at the time Mr. Nowland prepared his report. As GEA US points out, it will be prejudiced "if Mr. Nowland is permitted to provide testimony to the jury regarding his reliance on a new standard that he did not, but could have, reviewed both after serving his expert report and before his deposition." (Doc. 47-1 at 26.) The court agrees. Plaintiffs do not request a continuance and, "[g]iven the number of extensions previously granted" in this case, (Doc. 38), and the close of discovery almost a year ago on August 1, 2025, another continuance is not warranted. *See Alexander v. City of Syracuse*, 2026 WL 118852, at *16 (N.D.N.Y. Jan. 16, 2026) ("[A]s for the fourth factor, a continuance has not been requested, nor would one be within the realm of reasonable possibilities.") (citation omitted). Mr. Nowland's opinions regarding the 1997 edition of NFPA 79 are thus inadmissible.

Mr. Nowland relied on other sources in forming his opinions, including 7 C.F.R. § 58.146, OSHA Hazard Communication Standard, U.S. Department of Agriculture Dairy Equipment Review Guidelines, the 1993 version of NFPA 70, and UL Standard for Safety for Industrial Control Panels 503A. The court thus turns to whether the cited

---

[12] If Plaintiffs contend that Mr. Nowland's testimony related to NFPA 79 is of great importance, that would "only serve[] to underscore the inexcusable quality of its delayed submission." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2025 WL 2770640, at *6 (S.D.N.Y. Sept. 26, 2025) (internal quotation marks and citation omitted).

22

sources support his opinions and whether his opinions are reliable and helpful to the jury.

### D.    Mr. Nowland's Opinion 1.

GEA US argues Mr. Nowland's Opinion 1 regarding the CIP Hold button must be excluded as an *ipse dixit* because it was "invented . . . out of whole-cloth and has no support whatsoever . . . in published literature, the engineering or scientific community[,] or [] governmental agencies[]" and because, "when asked at his deposition if he had thought about other potential hazards that could arise if this 'CIP Hold' button was implemented, Mr. Nowland indicated he was not prepared to do that." (Doc. 47-1 at 17.)[13] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (citation omitted).

Under New York law, a design defect claim generally "requires expert testimony as to the feasibility and efficacy of alternative designs." *Quiles v. Bradford-White Corp.*, 2012 WL 1355262, at *8 (N.D.N.Y. Apr. 18, 2012) (citation omitted). Expert witnesses "can prove the feasibility and efficacy of alternative designs either by (1) showing, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, or (2) identifying makers of similar equipment who have already put into use the alternative design." *Charter Oak Fire Ins. Co. v. Yeadon Fabric Domes, LLC*, 783 F. Supp. 3d 696, 731 (N.D.N.Y. 2024) (internal quotation marks and citation omitted). "[Testing] is the touchstone of what an engineering expert in a design defect case should do." *Barban*, 2005 WL 387660, at *5. As a result, courts generally exclude as unreliable expert testimony of an alternative feasible design when the expert witness did not engage in any testing regarding that

---

[13] GEA US argues that Mr. Nowland's opinion regarding a CIP Hold button is "also unnecessary given the numerous ways that Mr. Omar could have safely performed th[e] repair without being injured." (Doc. 47-1 at 30) (emphasis omitted). Even though there were allegedly other ways for Mr. Omar to perform the repair, those alternative options may be relevant to Mr. Omar's contributory negligence but do not require exclusion of Mr. Nowland's opinions regarding a CIP Hold button. They are, however, relevant to the issue of causation.

23

design.[14]

"However, 'such testing is not required if the expert can point to an existing design in the marketplace' that incorporates the expert's proposed alternative." *Ferlito v. Harbor Freight Tools USA, Inc.*, 2025 WL 1181699, at *3 (E.D.N.Y. Apr. 23, 2025) (alteration adopted) (quoting *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 178 (E.D.N.Y. 2008)). Some courts also "suggest that 'drawings, models, and calculations' which are 'rooted in reliable scientific reasoning and methodology' may suffice in lieu of real-world testing." *Baldi-Perry v. Emerson Elec. Co.*, 2025 WL 601232, at *7 (W.D.N.Y. Feb. 25, 2025) (quoting *Miller v. Sportsman's Guide, LLC*, 2024 WL 1683842, at *9 (W.D.N.Y. Mar. 28, 2024), *report and recommendation adopted*, 2024 WL 1678072 (W.D.N.Y. Apr. 18, 2024)). Nonetheless, "[a]dherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 76 (S.D.N.Y. 2001) (collecting cases).

---

[14] *See, e.g.*, *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004) ("In the absence of drawings, models, calculations, or tests, it was not manifest error for the [d]istrict [c]ourt to find that [the expert witness]'s testimony was insufficiently reliable."); *Quintanilla v. Komori Am. Corp.*, 2007 WL 1309539, at *5 (E.D.N.Y. May 4, 2007) ("[The expert witness]'s failure to test his proposed alternative, namely placing a nip guard on the Komori Lithrone 640 to determine whether it would indeed provide a safer alternative and whether it would even be feasible so as not to impact the utility of the machine, leads to the conclusion that his opinion is based on nothing more than speculation."), *aff'd*, 2009 WL 320186 (2d Cir. Feb. 10, 2009); *Barban v. Rheem Textile Sys., Inc.*, 2005 WL 387660, at *5 (E.D.N.Y. Feb. 11, 2005) ("[The expert witness]'s failure to test his proposed alternative, to determine its impact, if any, on the machine's utility, or to identify a pressing machine model manufactured in 1970 with a head guard (or that such technology existed at that time), drives the [c]ourt to exclude evidence of the feasibility of the head guard alternative."), *aff'd*, 147 F. App'x 222 (2d Cir. 2005); *Lara*, 174 F. Supp. 3d at 737 (excluding the expert witness's opinion as to an alternative design because he "performed no meaningful tests or calculations, [] prepared no drawings of any such proposed design alternative or otherwise [] conducted any meaningful comparison of the cost versus utility of an alternative design theory[]"); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 187 (E.D.N.Y. 2009) ("[The expert witness]'s failure to test his proposed alternative, namely placing a rope guard and divider on the manually operated cathead at issue to determine whether it would indeed provide a safer alternative and whether it would even be feasible so as not to impact the utility of the machine, leads to the conclusion that his opinion is based on nothing more than speculation.").

Mr. Nowland did not conduct any test or study to support his opinions that a CIP Hold button could have been implemented in the Whey Clarifier control panel or that a CIP Hold button would have prevented Mr. Omar's accident. *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (observing that an expert witness's "failure to test a theory . . . can justify a trial court's exclusion of the expert's testimony[]"). He did not identify any machinery existing in the marketplace containing a CIP Hold button.[15] He has not offered any drawings, models, or calculations to support his proposed CIP Hold button. *Cf. Miller*, 2024 WL 1683842, at *9 (admitting expert testimony of an alternative design because the expert "offered drawings, models, and calculations to support . . . his proposed alternative design[]" and the "product design is not novel or complicated[]"). His proposed CIP Hold button appears to be an idea that has neither been adopted, tested, reviewed, designed, nor implemented. He was not able to identify the feasibility of the design and could not address the pros and cons of its implementation. "In a products liability case, the 'touchstone' of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Hilaire*, 54 F. Supp. 3d at 244 (citation omitted). "This is especially true in the area of engineering, where products must be practical." *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003).

Although Mr. Nowland observed that "implementing a CIP Hold function into [GEA US]'s machine is 'not that difficult[,]'" (Doc. 58-13 at 12), this conclusory opinion does not take the place of an alternative feasible design. Mr. Nowland's question, "[w]hy did GEA not provide a CIP Hold control function key to stop the automatic CIP process or incorporate this into the F3 Hold function?" coupled with his belief that, with a CIP

---

[15] *See Hilaire*, 54 F. Supp. 3d at 248 (excluding expert testimony of an alternative feasible design because the expert failed to conduct testing, and "there is no evidence of an existing trap guard design on the market that could be used with this [s]aw"); *Benjamin v. Fosdick Mach. Tool Co.*, 2015 WL 1822669, at *3 (W.D.N.Y. Apr. 22, 2015) (excluding expert testimony of an alternative feasible design because the expert "failed to test his proposed guard design" and "could not identify anyone who had actually utilized the alternative design which he proposed[]") (internal quotation marks omitted).

Hold button, Mr. Omar's "incident could have been averted[]" is not an alternative design. (Doc. 52-4 at 14.) It is not an opinion; it is speculation that does nothing to establish a design defect or assist the jury. *See Erazo v. SCM Grp. N. Am.*, 2019 WL 1044365, at *13 (E.D.N.Y. Mar. 5, 2019) ("An expert may not simply state that a design should have been different without analyzing and explaining why the new design would have been technologically feasible and practical.").

Because Mr. Nowland's opinion that a CIP Hold button could have been installed on the Whey Clarifier is wholly speculative and bereft of any factual or scientific support, his opinion related to a CIP Hold button is inadmissible as it is not reliable and will not be helpful to the jury. *See* Fed. R. Evid. 702. GEA US's motion to exclude Mr. Nowland's Opinion 1 is therefore GRANTED.

### E.    Mr. Nowland's Opinion 4.

According to Mr. Nowland's Opinion 4, "[t]he lack of accurate documentation and training poses safety risks that were exposed by Mr. Omar's incident and injuries." (Doc. 52-4 at 17) (emphasis omitted). In his deposition, Mr. Nowland stated, "I don't have the full set of documentation to make a complete – completely accurate decision" on Opinion 4. (Doc. 52-10 at 190:3-4.) GEA US argues that "Mr. Nowland's Opinion [] 4 is nothing more than speculation given that he does not possess the information necessary to complete his opinion." (Doc. 47-1 at 20.) At the February 12, 2026 Hearing, the parties disputed whether, by his statement, Mr. Nowland meant that he generally did not have documentation necessary to verify the accuracy Opinion 4, or whether he meant that he did not have documentation at his deposition necessary to verify the accuracy of Opinion 4. The excerpts the parties provide of Mr. Nowland's deposition do not resolve this dispute. Accordingly, the court cannot determine his meaning at this time.

GEA US alternatively claims Opinion 4 should be excluded because it contradicts Mr. Nowland's concessions that Mr. Omar did not follow certain warnings in GEA US's manuals and instructions and "that had Mr. Omar followed the warnings in the [Instruction] Manual perhaps he would not have been injured." *Id.* at 21. Even if Mr. Nowland conceded that Mr. Omar would not have been injured had he followed certain

26

instructions, he may still opine that "[t]he documentation provided by GEA is not adequate for use training operators[]" and that he "could not find a simple, valuable procedure how to operate the [Whey C]larifier and associated equipment in the Lactalis processing plant." (Doc. 52-4 at 17-18.) Those opinions "fit" with the facts and are supported by Mr. Nowland's experience, training, education, and expertise and are admissible. They do not, however, address the issue of causation because Mr. Nowland acknowledges that had Mr. Omar complied with OSHA's LOTO standards and Lactalis's Lock Out Procedures, he would not have been injured.

GEA US contends Mr. Nowland's Opinion 4 should be excluded to the extent that it addresses a failure to train because it is undisputed that Lactalis, not GEA US, trained Mr. Omar regarding operating the Whey Clarifier. Plaintiffs counter that "[i]t is undisputed that GEA [US]'s manuals for the subject [W]hey [C]larifier do not include any reference or instruction for use of the F3 Hold function[]" and "without direction or instruction from GEA [US], there appears to be no basis for Mr. Omar to fully understand the [] proper function of the F3 Hold from training by his employer." (Doc. 58-13 at 13) (internal citation omitted). Because Lactalis trained its employees based on GEA US's manuals and instructions, Mr. Nowland may opine regarding any deficiencies in GEA US's documentation. Accordingly, although no direct failure to train claim lies against GEA US, the alleged deficiencies in its documentation for the Whey Clarifier may be cited by Mr. Nowland in his testimony.

For the foregoing reasons, Mr. Nowland may testify to the inadequacy of the instructions GEA US provided for the Whey Clarifier. He may not, however, offer an opinion that GEA US was responsible for the training of Lactalis's employees, nor that GEA US's failure to train caused Mr. Omar's injuries. GEA US's motion to exclude Opinion 4 is thus GRANTED IN PART and DENIED IN PART.

## III.    Motion for Summary Judgment.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

27

56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment: "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

28

**B.      Whether GEA US Is Entitled to Summary Judgment on Mr. Omar's Failure to Warn Claim.**

To establish a failure to warn claim under New York law, a plaintiff must show "(1) a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm." *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 575 (E.D.N.Y. 2012) (citations omitted). "A defendant may establish its prima facie entitlement to summary judgment on a failure to warn claim by demonstrating 'that any allegedly inadequate warnings were not a proximate cause of the plaintiff's injuries, i.e., that additional or different warnings would not have deterred the product's misuse.'" *Ardi v. Miller*, 234 N.Y.S.3d 20, 21 (N.Y. App. Div. 2025) (internal citation omitted). In addition, "a failure to warn cause of action is appropriately dismissed if a plaintiff does not plead facts indicating how the provided warnings were inadequate." *Reed*, 839 F. Supp. 2d at 575.

In its motion, GEA US argues that Mr. Omar's "failure to warn claim fails as a matter of law" because he has "failed to establish facts showing how GEA US's warnings were inadequate[]" and because he has "not established that any alleged failure to warn or alleged inadequate warning was the proximate cause of [his] injuries." (Doc. 47-1 at 38-39.) In their opposition, Plaintiffs fail to address Mr. Omar's failure to warn claim and GEA US's arguments. As a result, this claim is abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Patane v. Nestle Waters N. Am., Inc.*, 786 F. Supp. 3d 474, 480 (D. Conn. 2025) ("It is particularly well-established in this Circuit that a party who fails to raise an 'argument in his opposition to a motion for summary judgment' forfeits that argument.") (alteration adopted) (citation omitted).[16] GEA US's motion for summary judgment on

---

[16] *See also Connelly v. City of St. Albans*, 2024 WL 1976658, at *21 (D. Vt. May 3, 2024) ("While [p]laintiff responded to [defendant]'s argument that he is entitled to qualified immunity under federal law for her § 1983 claim, she did not address [defendant]'s request for dismissal of her negligence claim. Her negligence claim has therefore been abandoned."); *Cui v. Fed. Bureau*

Mr. Omar's failure to warn claim is therefore GRANTED and this claim is DISMISSED.

### C.   Whether GEA US Is Entitled to Summary Judgment on Mr. Omar's Design Defect Claim.

#### 1.   Whether GEA US Was Required to Submit an Affidavit.

Plaintiffs argue that GEA US was required to submit an expert witness affidavit "[t]o obtain summary judgment [on] a design[]defect claim[.]" (Doc. 58-13 at 17.)[17] Under New York law, in order to obtain summary judgment on a design defect claim, the movant has the burden of establishing through an "affidavit of a person with 'qualifications, experience, or personal knowledge in the design, manufacture[,] or use' of the product that the product 'complied with all applicable industry standards' and that the product was 'reasonably safe for its intended use when it was manufactured' consistent with those industry standards." *Chamberlain v. MAC Trailer Mfg., Inc.*, 128 A.D.3d 1336, 1337-38 (N.Y. App. Div. 2015) (internal citations omitted). However, in federal court, "[a] defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). Instead, a defendant "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324); *see also Yun Tung Chow v. Reckitt & Colman, Inc.*, 17 N.Y.3d 29, 36 (N.Y. 2011) (Smith, J., concurring) (observing that the New York affidavit rule pertains to state courts and "federal courts have a different rule, which would probably lead to a different

---

*of Investigation*, 551 F. Supp. 3d 4, 16 (E.D.N.Y. 2021) ("Plaintiffs do not respond to [d]efendant's arguments that summary judgment is warranted on 'any claims based on the 2012 FOIA requests made by [plaintiffs] because they failed to exhaust administrative remedies and, in any event, the claims are untimely.' The [c]ourt therefore finds that [p]laintiff has abandoned these claims.") (alteration adopted) (internal citation omitted); *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 384 (E.D.N.Y. 2015) ("Defendants move for summary judgment on this claim. Plaintiff does not address the [] [d]efendants' arguments in her opposition, and the [c]ourt deems this claim abandoned.") (citation omitted).

[17] With its reply brief, GEA US submitted two affidavits of expert witnesses, Alex A. Rigoni and Robert A. van Akelijen, which were the subject of Plaintiffs' motion to strike which the court granted in part and denied in part.

30

result in this case[]").

The Supreme Court has held there is no "express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to 'the affidavits, *if any*' (emphasis added), suggests the absence of such a requirement." *Celotex Corp.*, 477 U.S. at 323 (emphasis in original). Accordingly, GEA US was not required to submit an expert witness affidavit in order to obtain summary judgment with regard to Mr. Omar's design defect claim.

### 2.    Whether Mr. Omar Can Establish a Design Defect Claim.

"In New York, to establish a design defect, a plaintiff must 'present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner.'" *Silva v. Heil, Inc.*, 692 F. Supp. 3d 29, 42 (E.D.N.Y. 2023) (quoting *Michael v. Gen. Motors LLC*, 790 F. App'x 275, 277 n.1 (2d Cir. 2019)). A plaintiff must also establish that "a defect in the product was a substantial factor in causing the injury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 86 (2d Cir. 2006) (emphasis, internal quotation marks, and citation omitted). "A claim premised upon a defective design theory requires that [p]laintiff show: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing [p]laintiff's injury." *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018) (citations omitted).

"Generally, under New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs." *Charter Oak Fire Ins. Co.*, 783 F. Supp. 3d at 731 (internal quotation marks and citation omitted). "[U]nless a reasonable alternative design is both obvious to and understandable by a layperson, an expert is needed." *Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 91 (N.D.N.Y. 2010) (citation omitted); *see also Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008) ("New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases

31

involving more complex design issues.") (collecting cases).

> The issue of whether a product has a design defect

> is determined by whether a reasonable person with knowledge of the potential for injury of the product and of the available alternatives, balancing the product's risks against its utility and costs and against the risks, utility and cost of the alternatives, would have concluded that it should not have been marketed in the condition that it was.

*Silva*, 692 F. Supp. 3d at 42 (internal quotation marks and citations omitted). "Whether a product is defectively designed such that its utility outweighs its dangers is typically a question of fact for the jury." *Amica Mut. Ins. Co. v. WHAC LLC*, 447 F. Supp. 3d 6, 9 (W.D.N.Y. 2020); *see also Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108 (N.Y. 1983) ("It will be for the jury to decide whether a product was not reasonably safe in light of all the evidence presented by both the plaintiff and defendant.").[18] However, where there is no expert witness testimony regarding a feasible alternative design, summary judgment may be appropriate. *See Amica Mut. Ins. Co.*, 447 F. Supp. 3d at 10 (granting summary judgment for defendant on plaintiff's design defect claim because "[p]laintiff offers no evidence of any kind concerning the existence or feasibility of an alternative design in this matter[]").

In this case, the design of the Whey Clarifier and its manufacturing and cleaning processes are not comprehensible to a lay person at least insofar as an alternative design is considered. As a result, Mr. Omar was required to proffer expert testimony establishing the feasibility and efficacy of an alternative design for his design defect claim. *See*

---

[18] In determining whether a design defect exists, the following factors are to be considered:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product – that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 109 (N.Y. 1983) (citations omitted).

*Guarascio*, 582 F. Supp. 2d at 463-64 (collecting cases and noting that when a design defect is one of sufficient complexity, expert testimony is required).

In his opinions, Mr. Nowland proposes a CIP Hold button for the Whey Clarifier but neither offers a design for that button nor explains how it is a feasible alternative. *See Mancuso v. Reebok Int'l, Ltd.*, 171 N.Y.S.3d 691, 692 (N.Y. App. Div. 2022) ("Where . . . a plaintiff's expert 'opines that a particular product is defective or dangerous, describes why it is dangerous, explains how it can be made safer, *and concludes that it is feasible to do so*, it is usually for the jury to make the required risk-utility analysis[.]'") (emphasis supplied) (citation omitted). Indeed, when questioned about the feasibility of a CIP Hold button in his deposition, Mr. Nowland acknowledged he would "have to look at the whole process in the system and evaluate it all[]" and admitted he was "not prepared to do that here today." (Doc. 53-2 at 130:8-10); *see also Amica Mut. Ins. Co.*, 447 F. Supp. 3d at 10 (granting summary judgment for defendant on plaintiff's defective design claim "because plaintiff has utterly failed to raise a genuine issue of material fact on the second element of its design defect claim – specifically, that there was a technically feasible way to design the vehicle in such a way that the conductor at issue would be shielded from corrosion[]"); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 443 (W.D.N.Y. 2001) (granting summary judgment for defendants on plaintiff's design defect claim because "plaintiffs have not offered evidence of a feasible, safer alternative design").

Mr. Nowland has neither designed nor tested his proposed CIP Hold button. In addition, he points to no other CIP Hold buttons available in the marketplace. He therefore cannot opine to "the availability of a safer design; . . . the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; . . . [or] the manufacturer's ability to spread any cost related to improving the safety of the design." *Voss*, 59 N.Y.2d at 109 (citations omitted). Although Plaintiffs urge the court to find this issue is for a jury's determination, they do not explain how a jury can find an alternative design was feasible without expert witness testimony and evidence to assist it. *Cf. Adams v. Genie Indus., Inc.*, 14 N.Y.3d 535, 543-44 (N.Y.

33

2010) (upholding a jury's determination of a design defect because "plaintiff's evidence showed more than a theoretical possibility of a safer machine[]" and thus "the weight to be given the evidence for each side was up to the jury[]").

The court has excluded Mr. Nowland's testimony regarding a CIP Hold button. There is thus no expert testimony to establish the existence or feasibility of an alternative design for the Whey Clarifier. Summary judgment in favor of GEA US on Mr. Omar's design defect claim is therefore GRANTED.[19]

### D.   Whether GEA US Is Entitled to Summary Judgment on Mr. Omar's Negligence Claim.

Under New York law, a plaintiff's "claim based upon an alleged design defect . . . sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently." *Oden*, 330 F. Supp. 3d 877 (collecting cases).[20] "The feasibility of an alternative design is an 'element of design[]defect claims under both strict product liability and negligence theories.'" *Nemes v. Dick's Sporting Goods, Inc.*, 521 F. Supp. 3d 328, 340 (S.D.N.Y. 2021) (alteration adopted) (citation omitted).

Mr. Omar's negligence claim suffers from the same evidentiary deficiencies as his

---

[19] *See Zaremba*, 360 F.3d at 360 ("In view of the [d]istrict [c]ourt's decision to exclude the testimony of plaintiffs' experts, summary judgment for defendant [on plaintiffs' design defect claim] was appropriate."); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("Having determined that the district court acted within its discretion in excluding [the expert witness]'s testimony, the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity. As a result, summary judgment was properly granted."); *Silva v. Heil, Inc.*, 692 F. Supp. 3d 29, 42 (E.D.N.Y. 2023) (granting defendant summary judgment on plaintiffs' design defect claim because, "[h]aving excluded the design defect testimony of [plaintiffs' expert witness], [p]laintiffs do not have any evidence that the dump body had a defect or any evidence of the feasibility of an alternative design that would have prevented [p]laintiff's injury[]").

[20] *See also Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 2023 WL 3455057, at *10 n.8 (E.D.N.Y. May 15, 2023) ("When a plaintiff's theory of negligence is the same as a theory for strict products liability, the two claims are 'functionally synonymous.' The [c]ourt should view them as 'duplicates' of each other.") (alteration adopted) (internal citation omitted); *Desch v. Merz N. Am., Inc.*, 2023 WL 2734671, at *6 (E.D.N.Y. Mar. 31, 2023) ("Under New York law, a plaintiff's claims based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently, in the sense that a fatal flaw in the strict liability allegations likely defeats the negligence claim as well.") (alterations adopted) (internal quotation marks and citation omitted).

design defect claim. For the same reasons the court has granted GEA US summary judgment on Mr. Omar's design defect claim, GEA US's motion for summary judgment on Mr. Omar's negligence claim is GRANTED. *See Nemes*, 521 F. Supp. 3d at 340 ("Plaintiffs have failed to establish a feasible alternative design . . . . Accordingly, the [c]ourt grants summary judgment in favor of [d]efendants with respect to [p]laintiffs' negligence claim for design defect.").

    **E.**    **Whether GEA US Is Entitled to Summary Judgment on Mr. Omar's Breach of Warranty Claim.**

In its motion, GEA US argues that it is entitled to summary judgment on Mr. Omar's breach of warranty claim because it is "barred by the Statute of Limitations[]" and "there is no privity between the parties." (Doc. 47-1 at 41.) In their opposition, Plaintiffs do not address either Mr. Omar's breach of warranty claim or GEA US's summary judgment argument. This claim is thus deemed abandoned. *See Gonzalez v. City of N.Y.*, 442 F. Supp. 3d 665, 684 (S.D.N.Y. 2020) ("[Plaintiff] abandoned these claims because he did not address [d]efendants' arguments for summary judgment in his opposition."), *aff'd*, 845 F. App'x 11 (2d Cir. 2021). GEA US's motion for summary judgment on Mr. Omar's breach of warranty claim is GRANTED and this claim is DISMISSED.

    **F.**    **Whether GEA US Is Entitled to Summary Judgment on Ms. Ahmed's Loss of Consortium Claim.**

"Under New York law, the spouse of an injured plaintiff may recover for loss of services and consortium." *Gonzalez v. United States*, 612 F. Supp. 3d 336, 349 (S.D.N.Y. 2020), *aff'd*, 80 F.4th 183 (2d Cir. 2023). However, "[a] claim for loss of consortium or services is a derivative action, and in the common law of New York, does not exist independent of the injured spouse's right to maintain an action for injuries sustained." *Trask v. Carbon Prods., Inc.*, 678 F. Supp. 3d 375, 394 (W.D.N.Y. 2023) (internal quotation marks and citation omitted); *see also Kloner v. United States*, 196 F. Supp. 3d 375, 391 (E.D.N.Y. 2016) ("Derivative claims, such as those for loss of consortium, cannot exist 'independent of the injured spouse's right to maintain an action for injuries sustained.'").

35

Because the court has granted GEA US summary judgment on Mr. Omar's claims, GEA US's motion for summary judgment on Ms. Ahmed's loss of consortium claim is GRANTED as well. *See, e.g., Trask*, 678 F. Supp. 3d at 394 ("Because [the husband] cannot succeed on his substantive claims against [defendant], [the wife]'s loss of consortium claim necessarily fails."); *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 304 (E.D.N.Y. 2013) ("[The husband]'s loss of consortium claim cannot survive summary judgment rejecting his wife's claims."), *aff'd*, 578 F. App'x 51 (2d Cir. 2014).

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART GEA US's motion to exclude Plaintiffs' expert witness, C. Martin Nowland. (Doc. 47.) The court GRANTS GEA US's motion for summary judgment, (Doc. 47), DISMISSES Mr. Omar's manufacturing defect claim, and directs the clerk of court to enter final judgment in GEA US's favor.

SO ORDERED.

Dated this 16th day of July, 2026.

Christina Reiss, District Judge
United States District Court